IN THE UNITED STATES DISTICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. MICHELLE HERSHBERGER, as co-Special Administrator of the Estate of ALAN JAY HERSHBERGER, deceased,<br><br>      Plaintiff,<br><br>v.<br><br>1. CORECIVIC, INC., a foreign for-profit business corporation;<br><br>2. JOSEPH NORWOOD, in his individual capacity as Warden of Davis Correctional Facility;<br><br>3. DAVID SINGLETON<br><br>      Defendants, | Case No:   24-CV-99-GLJ<br><br>ATTORNEY LIEN CLAIMED<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW the Plaintiff, Michelle Hershberger ("Plaintiff"), as Special Administrator of the Estate of Alan Jay Hershberger, deceased, by and through her attorneys of record, and for her causes of action against the Defendants, alleges and states as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, Michelle Hershberger ("Plaintiff"), is a citizen of Kansas and the duly-appointed co-Special Administrator of the Estate of Alan Jay Hershberger.

2.    Michelle and Alan were married in 2007, but legally separated in or around August of 2018. Michelle and Alan lived separately for years and were not legally married on July 31, 2022.

3. CoreCivic, Inc. ("CoreCivic" or "Defendant") is a foreign, for-profit business corporation that conducted business in Hughes County. CoreCivic is a private corrections company that contracted with the Oklahoma Department of Corrections ("DOC"), during the pertinent timeframe, to operate private prisons. CoreCivic was at all times relevant hereto responsible, in part, for providing care and supervision to Dustin while he was in the custody of the DOC at Davis Correctional Facility ("DCF" or "Prison") in the town of Holdenville, Hughes County, OK.[1] CoreCivic was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the housing and supervision of inmates at the Prison, and for training and supervising its employees. CoreCivic was, at all times relevant hereto, endowed by the state of Oklahoma with powers or functions governmental in nature, such that CoreCivic became an agency or instrumentality of the State and subject to its constitutional limitations.

4. CoreCivic is charged with implementing and developing the policies of the DOC and the Oklahoma Jail Standards with respect to the care and supervision of inmates in the custody of the DOC who are housed at DCF, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees

5. Defendant Joseph Norwood ("Warden Norwood" or "Defendant Norwood") a CoreCivic employee, was the Warden of Davis Correctional Facility acting under color of state law at all relevant times hereto. Upon information and belief, Warden Norwood resides in Hughes County, Oklahoma and is sued in his individual capacity, based on his supervisory role at DCF.

---

[1] CoreCivic ceased operating DCF on October 1, 2023 when the DOC did not extend its contract with CoreCivic and took over operations of the Prison. *See*, Keaton Ross, *Oklahoma closer to eliminating private prisons with takeover of Davis facility*, Oklahoma Watch, https://oklahomawatch.org/2023/08/31/oklahoma-inches-closer-to-eliminating-private-prisons/.

6. Upon information and belief to be confirmed through discovery, Defendant David Singleton ("Singleton") was at all times relevant hereto, a resident of Hughes County, Oklahoma. At all times relevant hereto, Singleton was employed by CoreCivic as a lieutenant at DCF. At all pertinent times, Singleton was acting within the scope of his employment and under color of state law.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.[2]

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District

**FACTUAL ALLEGATIONS**

11. Paragraphs 1 through 10 are incorporated herein by reference.

---

[2] While Plaintiff does not believe CoreCivic is subject the Oklahoma Government Tort Claim Act, 51 O.S. § 151, *et seq.*, out of an abundance of caution Plaintiff provided CoreCivic notice of the claims herein on June 22, 2022, pursuant to 51 O.S. § 156. CoreCivic did not respond to said notice and the same was deemed denied by operation of law. This action is timely filed within 180 days of the denial of Plaintiff's claims, as required by 51 O.S. § 157.

12. Alan was hired by CoreCivic on or around October 11, 2021 to work as a correctional officer at its facility in Leavenworth, Kansas.

13. Leavenworth, which had a laundry list of issues, was closed at the end of 2021, when CoreCivic's contract with the United States Government was not renewed.[3]

14. Around the time that the Leavenworth facility was closed, DCF was extremely understaffed and in need of additional officers, so CoreCivic asked that Alan move to Holdenville, OK to work at DCF temporarily.

15. In the summer of 2022, Alan was assigned to DCF's Alpha South Unit, where Gregory Thompson was being housed.

16. At approximately 8:30 a.m. on July 31, 2022, Hershberger had an encounter with an inmate in the Alpha Unit. During the altercation, the inmate referred to Alan as a "bitch ass n***r." In a moment of frustration, Hershberger allegedly responded by saying, "I'm not a 'bitch ass n***r', you're the 'bitch ass n***r.'"

17. Alan immediately recognized that he had made a mistake in responding to the inmate in the way that he did and began profusely apologizing.

18. Alan was incredibly upset with his reaction to the inmate and called a supervisor, Lieutenant David Singleton, to the unit to talk about the encounter.

19. DCF Lieutenant David Singleton, arrived at the Alpha South Unit at approximately 8:40 a.m. and Alan informed him of what had occurred.

---

[3] *See*, Allison Kite, *Kansas county scuttles talk of converting Leavenworth jail to ICE detention center*, Missouri Independent, https://missouriindependent.com/2023/09/21/kansas-county-scuttles-talk-of-converting-leavenworth-jail-to-ice-detention-center/#:~:text=The%20facility%20closed%20at%20the,with%20private%20criminal%20detention%20facilities.

20. Knowing that other inmates had overheard the encounter, Alan was fearful for his safety and asked Lieutenant Singleton if he could be moved to a different unit.

21. According to interviews conducted in the wake of Alan's death, Lieutenant Singleton advised that he had been working on having Alan transferred to a different unit to give him "a break from working in the difficult unit." However, Singleton noted that Alan was forced to stay on the unit because the Prison did not have "a lot of staff members that day" and he had not found a suitable arrangement to change Hershberger out with another officer to another duty."

22. Approximately thirty minutes after speaking with Singleton, Alan was supervising inmates on the Alpha South exercise yard.

23. Two inmates wanted to go back inside the unit, so Alan walked the inmates to the doorway of the unit to allow them back inside.

24. As Alan was holding the door for the inmates at approximately 9:09 a.m., he can be seen having a conversation with another inmate who is standing nearby.

25. Unbeknownst to Alan, but Thompson was just inside the Alpha South Unit with a large homemade knife as Alan was holding the door open for the other inmates.

26. As Alan was facing toward the rec yard speaking with other inmates, Thompson came up behind Alan and stabbed him in his lower back area with a 16" homemade knife/shank.

27. Alan then stumbled out into the yard and yelled "I've been stabbed."

28. Thompson followed after Hershberger and yelled "on the set" and "on the crips", to signal that the Crips prison gang was responsible for the murder.

29. A nearby detention officer immediately called for more staff, who began to secure the inmates that were milling about in the rec yard.

30.     Thompson was moving around the officers who responded to the scene, still holding the 16" knife. After a few moments Thompson was directed to a fenced in basketball court, with other inmates, just south of the Alpha South Unit doors.

31.     At 9:11 a.m., Thompson can be seen on camera throwing the knife onto the Alpha Unit South roof.[4]

32.     Thompson was quickly identified as the inmate who stabbed Alan and was taken to a holding cell at the Prison.

33.     An investigator with the DOC interviewed Thompson on the afternoon of July 31, 2022, while Thompson was in the holding cell. After reading Thompson his Miranda rights, the investigator asked Thompson to tell him about the incident.

34.     The first thing Thompson said in response was "[t]his is something the guards and everyone saw coming."

35.     Thompson was charged with first degree murder on August 22, 2022. *See* Hughes County District Court Case No. CF-2022-50. The charges are still pending.

➢ **Thompson's Dangerous History and his Incorrect Security Classification**

36.     Prior to the murder, Thompson had an extensive, dangerous and well-documented criminal history, both in and out of prison.

37.     In December OF 2003, Thompson was arrested and charged with first-degree murder, for his role in the shooting death of Oklahoma City resident Jerry McQuinn. *See* Oklahoma County District Court Case No. CF-2003-6542. The case proceeded to a jury trial in December of

---

[4]     The weapon used by Thompson was later recovered and was described as 16" long with a 12" blade.

2005, and Thompson was found guilty. In January of 2006, the Court sentenced Thompson to life without parole for the murder.

38.     After receiving the life sentence, Thompson was incarcerated at the Oklahoma State Penitentiary ("OSP") in McAlester, Oklahoma.

39.     During an inmate count at on Sept. 3, 2009, staff at OSP "saw inmate Daniel Clayton lying on the floor of the cell bloody and unresponsive ... (and) saw inmate Gregory Thompson standing over Daniel Clayton wiping his hands." Thompson allegedly then handed officers a homemade knife while saying, "it isn't what it looks like I had to defend myself."[5]

40.     Daniel Clayton later died from the injuries he received from Thompson and Thompson was later charged with first-degree murder. *See State v. Thompson*, Pittsburg County Case No. CF-2010-393.

41.     Thompson ultimately pleaded guilty to a reduced charge of first-degree manslaughter and was sentenced to a five-year term in ODOC custody. Thompson also pleaded guilty to a felony charge of possession of contraband by an inmate and received a 10-year sentence. The possession of contraband related to his possession of a weapon.

42.     As such, on July 31, 2022, Thompson had already been convicted of/pled guilty to murdering one individual in 2003 and stabbing a fellow inmate to death with a homemade knife in 2010.

43.     Despite his dangerous past, CoreCivic staff at DCF classified Thompson as "unrestricted" and placed him into general population at the Prison.

---

[5]     *See*, Derrick James, *Inmate Accused in Prison Guard Death*, McAlester News-Capital, https://money.yahoo.com/inmate-accused-prison-guard-death-153500816.html.

44. According to Jessica Scott, a correctional officer who worked with Hershberger during a six-week stint at Davis, Thompson "should not have been in general (population), knowing how violent he was and his history," said. "Administrative segregation is where he should have been."[6]

45. DOC policy requires that facilities conduct a review of each new inmate to ensure that the inmate is appropriately classified.

46. The initial classification review, and any subsequent reviews, is primarily the responsibility of "case managers" at the Prison.

47. In the months prior to Alan's death, the Prison was having issues regarding its case managers. By way of example:

   a. On February 11, 2022, a DOC official "[a]gain reminded Warden of issues regarding classification, case notes, CAS, transfer packets." Warden Norwood was advised "that case managers were falling behind in all areas and must be able to complete their duties."

   b. On June 10, 2022, it was noted that "[s]ome of the case managers are new and have not received adequate training.".

   c. On July 22, 2022, a DOC employee reviewed the findings of an audit with the Prison's "Classification Coordinator" regarding deficient "case notes, adjustment reviews and custody assessments" from case managers.

   d. On November 23, 2022, an employee with the DOC "[m]et with Warden Norwood regarding case manager's issues and classification issue[s] that are not being properly addressed."

48. CoreCivic's failure to ensure that inmates with a dangerous history, like Thompson, were being properly classified resulted in Thompson being housed in general population with less

---

[6] *See*, Sean Murphy, *Staffing shortages, violence plague Oklahoma prisons*, AP, https://apnews.com/article/prisons-violence-united-states-oklahoma-612b1d541f1f6522662a4ad20d4a0ff1.

8

supervision. The lack of eyes on Thompson made it such that he was able to craft the 16" knife that he used to kill Alan.

➢ **CoreCivic's Dangerous Work Environment**

49.  It's undeniable that prisons are often inherently dangerous places to work. However, CoreCivic has maintained a culture of indifference that allows violence to flourish within its facilities, which vastly exceeded any of the expected risks.

50.  The danger largely comes from CoreCivic's practice of severely understaffing its facilities, which makes it impossible to run a safe and secure prison

51.  Records from the Prison in 2022, demonstrate that the Prison consistently lacked the necessary amount of staff.  For instance, it was noted that the Prison "continues to be short staff[ed]" on six (6) different occasions in March, April and June of 2022. Additionally, a report from July 29, 2022, two days prior to Hershberger's death, the Prison had over 70 vacant jobs for which it was attempting to fill.

52.  Furthermore, the Annual Operation Audit of DCF, completed on November 4, 2021, noted that DCF "has not maintained the approved staffing pattern during the audit period. The staffing level at the time of the audit was 71%."

53.  The lack of staff available at DCF created a host of latent dangers to detention staff. Three, of the many, of consequences of CoreCivic's policy of understaffing DCF are specifically noted below.

54.  **First**, the understaffing resulted in Prison employees being forced to supervise a large number of inmates.

55. According to former Davis correctional officer, Jamie Sasnett, "he often guarded 120 prisoners by himself and up to 240 on occasion," due to the lack of staff at the Prison[7]

56. It is well understood that the less staff members available to supervise inmates creates a greater risk of injury to detention officers.

57. **Second**, the lack of staff also caused the prison to go on lockdown constantly, which is also understood to enhance violence and danger within a correctional facility

58. In the Oklahoma Watch's September 2022 story, Bobby Cleveland, the executive director of Oklahoma Corrections Professionals stated that DCF was "locking down constantly because they don't have enough staff." Former Davis correctional officer Jamie Sasnett was also interviewed for the story and noted that "staffing shortages regularly kept prisoners in their cells during his three years on the job."[8]

59. **Third**, the Prison's lack of staffing resulted in a host of illegal contraband being in the Prison.

60. For instance, a DOC report from March 25, 2022, noted that the "[f]acility continues to be short staff[ed]," but that DCF was scheduled to get 11 temporary employees the next week. Warden Norwood indicated that with additional staff he was going to attempt to conduct "a facility shakedown" search.

---

[7]     *See*, Ashlyn Huffman, *Stabbings Soar at Southeast Oklahoma Private Prison*, Oklahoma Watch, https://oklahomawatch.org/2022/09/16/stabbings-soar-at-southeast-oklahoma-private-prison/.; *see also*, Diamond Hubbard, Poor prison conditions for employees, leads to dangerous incidents, 7News, https://www.kswo.com/2022/08/03/poor-prison-conditions-employees/ ("The policy book says it should be two guards per unit, this man was on a unit by himself.").

[8]     The lack of qualified staff at DCF was further exacerbated by the July 2022 death of correctional officer Alan Hershberger. For instance, in an August 12, 2022 DOC report, following Hershberger's death it was noted that "[s]taff is very concerned for their safety and new hired staff has declined employment after the death of a staff member."

61. That next week, beginning on March 28, 2022, staff began the process of conducting a search for weapons and other contraband in the Prison. On just the first day, Prison staff recovered 49 sharpened weapons and after just a few days a total of 110 sharpened weapons were discovered.

62. Clearly, CoreCivic knew that inmates had access to a dangerous number of homemade weapons but was unable to do anything to stop it due to the lack of staff.

63. Former DCF employee, Jamie Sasnett, explained that he attempted to notify DCF superiors twice about the level to which inmates were making weapons, but was ignored each time.[9]

64. The violence caused by the sheer number of weapons within DCF was observed by the supervisor of the Hughes County emergency medical services, who stated "We've never ever had this many stabbings before, and with different types of shanks. We've been told there's been plastic shanks and metal shanks, serrated and smooth,"[10] The emergency medical employee continued stating: "One was almost 12- inches long. How are you walking around with a 12-inch shank and not getting caught? Unless you just don't have enough staff to be looking for that? How do you break something that much and nobody notices?"

65. Moreover, a September 2022 story published by the Oklahoma Watch, indicated that 18 people had been stabbed in the first nine (9) months of 2022.[11] A few of the many stabbing incidents include:

---

[9] *See*, Huffman, *supra* note 7.

[10] *Id.*

[11] *Id.*

    a. On January 13, 2022, two inmates were observed fighting in the Fox Delta Pod at the Prison. After the fight was broken up an "8 ½ inch sharpened piece of metal with a cloth handle was recovered" from one of the inmates. The other inmate used a sock with a heavy item inside as a weapon, which was not recovered.

    b. On March 24, 2022, a 29-year-old DCF inmate bleeding profusely from his neck after being stabbed in the neck by another inmate. The inmate later died from the attack.

    c. On May 31, 2022, another DCF inmate was fatally stabbed in the abdomen. The inmate was stabbed at approximately 8:30 P.M., but DCF staff was not aware of the stabbing until 8:40 P.M., when an individual from outside the facility called the Prison to report that there had been an assault.

    d. On February 25, 2023, Brantley Avallone was found in his cell unresponsive and covered in blood.[12] It was later determined that Avallone had been stabbed repeatedly by his cellmate, Daniel Wilson.

66.    DCF is not the only CoreCivic prison that where staff is placed in unnecessary danger due to CoreCivic's policies. For instance, during a recent audit in Tennessee a detention officer at a facility there stated: "we have no help and really if you get assaulted, you're going to get assaulted until the inmates get tired of beating you because there are really no (correctional officers) available to come help you out."[13]

67.    CoreCivic and Defendant Norwood were clearly on notice that their practice of understaffing DCF, and other CoreCivic facilities, substantially increases the risks of violence and danger within its facilities.

---

[12]    *See*, *Inmate Dead Wilson Arrested for Murder at Davis Correctional Facility*, https://www.holdenvillenews.com/news/inmate-dead-wilson-arrested-murder-davis-correctional-facility.

[13]    *See*, Travis Loller and Jonathan Mattise, *Audit Finds Tennessee Prisons Severely Understaffed, Officers Worried About Safety*, Associated Press, https://www.usnews.com/news/best-states/tennessee/articles/2023-12-18/audit-finds-tennessee-prisons-severely-understaffed-officers-worried-about-safety.

68. Despite this knowledge the Defendants took no steps to ensure its staff members were adequately protected while performing their job duties. CoreCivic and Defendant Norwood also failed to alert Prison staff to the dangers they faced.

69. The risk faced by Alan, and other employees at the Prison, was qualitatively different from the types of risks Alan agreed to face when he accepted employment with CoreCivic.

## CAUSES OF ACTION

### COUNT I. VIOLATION OF FOURTEENTH AMENDMENT
### (DANGER CREATION/FAILURE TO PROTECT)
### *AS TO DEFENDANT SINGLETON*

70. Paragraphs 1 through 69 are incorporated herein by reference.

71. At the time of the complained of events, Alan had a clearly established due process right under the Fourteenth Amendment of the United States Constitution to life, liberty, and bodily integrity.

72. Singleton was directly responsible for placing Alan in a vulnerable position that could produce foreseeable and deadly consequences.

73. Singleton knew, or should have known, that instructing Alan to remain in the Alpha South Unit by himself on July 31, 2022 could result in Alan's death.

74. When Singleton directed Hershberger to remain on the Alpha South Unit, he was aware that (1) Alan was alleged to have used a racial slur; (2) Alan had asked to be moved from the unit for safety concerns; and (3) that Alan was supervising a dangerous and difficult group of inmates at the prison, which included Gregory Thompson.

75. Despite being aware of the danger faced by Alan, Singleton did not move Alan to another unit, or bring in another employee to help supervise the inmates and ensure that Alan was safe.

76. Instead, Singleton required Alan to remain on a unit with inmates that it knew were likely to cause injuries to Alan and therefore enhanced and/or created the danger and put Alan at substantial risk of serious, immediate, and proximate harm.

77. Defendant Singleton's conduct in this regard was reckless and in conscious disregard of the risk to Alan.

78. Defendant Singleton's conduct in requiring Alan to remain in the Alpha South Unit, despite knowledge of the specific threat posed to him was conscious shocking.

79. As a direct proximate result of the Defendant's unlawful acts and/or omissions, Alan suffered physical pain, severe emotional distress, mental anguish, terror, and ultimately death.

80. Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendant's conduct, acts and omissions alleged herein constitute reckless or callous indifferences to Alan's federally protected rights

### COUNT II. VIOLATION OF FOURTEENTH AMENDMENT
### (DANGER CREATION/FAILURE TO PROTECT)
### AS TO DEFENDANT CORECIVIC AND NORWOOD[14]

81. Paragraphs 1 through 80 are incorporated herein by reference.

---

[14] CoreCivic is a "person" for purposes of 42 U.S.C. § 1983. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) ("Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits has extended the *Monell* doctrine to private § 1983 defendants.") (citations omitted)).

82. Alan's Fourteenth Amendment guarantee of life, liberty, and bodily integrity, included the consequential right to be free from governmental policies that create or increase the risk of serious bodily harm or death from third parties.

83. Defendant CoreCivic has an unconstitutional policy or practice of maintaining chronically inadequate staffing levels at DCF, which leaves staff members, like Alan, exposed to serious risks of violence.

84. There is an affirmative causal link between the aforementioned acts and/or omissions of Defendant Singleton, in being deliberately indifferent to Alan's right Fourteenth Amendment rights, and the above-described customs, policies and/or practices carried out by CoreCivic and Defendant Norwood.

85. For instance, Defendant Singleton indicated that he would have had Alan transferred to another Unit for his safety, but was unable to do so because the Prison did not have "a lot of staff members that day."

86. CoreCivic created obvious and well known dangerous conditions that, would not have existed but for its affirmative actions, and to which Hershberger would not have been subjected.

87. CoreCivic's practice of inadequate staffing further resulted in an established policy whereby inmates were regularly able to access and obtain dangerous weapons.

88. For instance, there had been at least eighteen stabbing incidents in 2022 alone, multiple of which were fatal. Despite having knowledge of the risk to Prison staff from the sheer number of makeshift weapons, CoreCivic did nothing to ensure that supervising staff was safe while in the presence of inmates.

89. Furthermore, CoreCivic had a policy, practice, and/or custom of failing to properly classify and house dangerous inmates, like Thompson.

90. As a result, Thompson, who had already been convicted on two separate occasions for killing another individual, was permitted to remain in general population, without the level of supervision that an inmate with his violent history required.

91. As a result of the aforementioned policies, CoreCivic actively took steps that placed Hershberger at a substantial risk of serious, immediate, and proximate harm by placing him in a position of danger, and therefore increasing his vulnerability to such danger, for private acts of violence.[15]

92. CoreCivic created obvious and well known dangerous conditions that, would not have existed but for its affirmative actions, and to which Hershberger would not have been subjected.

93. CoreCivic's policies, procedures, and practices, recklessly or intentionally exposed Alan to an unreasonable risk of harm, with deliberate indifference to Alan's health, safety, and wellbeing.

94. These dangers and risks to Alan's life, safety, and bodily integrity were obvious, entirely foreseeable, and actually known to CoreCivic.

95. CoreCivic's conduct described herein, when viewed in total, is conscience shocking.

96. As a direct and proximate result of CoreCivic's policies, practices and/or customs, as described above, Alan experienced unnecessary physical pain, emotional distress, mental

---

[15] The customs, policies, and/or practices identified herein were adopted, promulgated and implemented by Defendant Norwood.

anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of his life.

97. Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as CoreCivic's conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Alan's federally protected rights.

### COUNT III. Negligence[16]
*As to Defendant CoreCivic*

98. Paragraphs 1 through 97 are incorporated herein by reference.

99. On July 31, 2022, CoreCivic permitted and required Hershberger to work on the Alpha South Unit, knowing the danger he faced and the likelihood that serious injury or death would occur.

100. CoreCivic knew it provided inadequate staffing at DCF to maintain a safe workplace for Alan and all of its other employees and all of the inmates in its custody on July 31, 2022.

101. Despite being aware of the significant risk faced by its officers, CoreCivic ordered and directed Alan to work under conditions in which it was certain and/or substantially certain that he would be seriously injured or killed. Defendant CoreCivic did so with specific knowledge of the dangerous and potentially deadly conditions under which Alan was assigned to work.

102. The actions taken by CoreCivic were substantially certain to give rise to the injuries suffered by Alan and did in fact result in his death.

---

[16] While Plaintiff does not believe CoreCivic is protected or subject to the Oklahoma Governmental Tort Claims Act, Plaintiff provided notice of her claims out of an abundance of caution. *See*, note 2.

103. CoreCivic's knowing disregard of the dangers posed by its actions and the risks posed by Thompson created a situation where CoreCivic's misconduct was substantially certain to lead to the precise harm that occurred when Thompson murdered Alan on July 31, 2022.

104. While generally, "an employer's liability for an employee's injuries is limited to the exclusive purview of the Workers' Compensation Court", when and an employer "act[s] with the knowledge that [an] injury was substantially certain to result from the employer's conduct," an employee is permitted to brings claims in district court. *Wells v. Oklahoma Roofing & Sheet Metal, LLC*, 457 P.3d 1020, 1025 (Okla. 2019) (citing *Parret v. UNICCO Serv. Co.* 127 P.3d 572, 575 (Okla. 2005)).

105. Additionally, the Supreme Court has explained the estate of a deceased employee may "bring a wrongful death action when the decedent was an adult, unmarried, and without children. *Whipple v. Phillips & Sons Trucking, LLC*, 2020 OK 75, ¶ 15, 474 P.3d 339, 345.

106. Because Plaintiff and Alan were not legally married due to separation, common law- divorce, and prior marriages, Plaintiff is permitted to bring her claim in district court.

107. CoreCivic's reckless disregard for the health and well-being of Alan was the proximate cause of Alan's injuries and death.

108. As a direct and proximate result of CoreCivic's actions, Alan experienced unnecessary physical pain, emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of his life.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of

filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted by:

SMOLEN LAW, PLLC

/s/ *John W. Warren*
Donald E. Smolen, II, OBA #19944
John W. Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK  74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*